## Shettler Estate

*Domenic P. Sbrocchi and Ronald W. Shipman,* for contestants.

*Ervin Hohensee,* pro se.

VAN ANTWERPEN, *J.,* May 25, 1984—This nonjury matter is before the orphans' court division for determination of issues raised in a formal caveat filed by the heirs of John M. Shettler, deceased, under a will dated September 25, 1981. Subsequent to probate, a purported second will dated November 4, 1983 was filed for probate by one Ervin Hohensee, executor named therein. After an informal hearing, the register of wills, on January 20, 1984, certified the matter to this court division for a determination of the issues. See 20 Pa.C.S. §907. From the hearings held in the regular nonjury session of this court on May 16 and 17, 1984, we make the following

## FINDINGS OF FACT

1. John M. Shettler was born on April 20, 1901 and lived with his wife at 15 Bell Avenue, Pen Argyl, Northampton County, Pa., until her death on November 3, 1982. The two had at that time two living children named Bernadine Williams and Joan Smith, a third child having died in infancy. Following the death of his wife, John M. Shettler went to live with his children—first with Mrs. Smith and then with Mrs. Williams. The relationship between John M. Shettler and his children and grandchildren was at all times warm and friendly.

2. Mr. Shettler had *heart problems* for some 15 years prior to his death and other extensive medical difficulties. He was hospitalized on July 1, 1968 with a myocardial infarction and readmitted with various problems on the following dates: April 15, 1970; December 25, 1977; November 11, 1978; November 8, 1981; February 20, 1983; March 6, 1983; April 15, 1983; and November 1, 1983.

3. John Shettler's problems included, among other things, blockages of the heart artery, emphysema, phlebitis, high blood pressure, diabetes and a hernia requiring surgical repair. His treating physician, Robert McEvoy, M.D., testified in particular that on or shortly before his admission on November 1, 1983, he had suffered a cerebral vascular accident, which meant that his brain was without oxygen for a period of time. As a result of this, he could not give accurate historical and background information and had difficulty with his thought process. He required oxygen by nasal tube and intravenous feeding.

4. John M. Shettler's mental condition was confirmed by a computerized brain scan performed in November, 1983 and, in the opinion of Dr. McEvoy,

Mr. Shettler was not competent in early November, 1983 to handle "legal affairs" of any kind. He improved somewhat by the second week in November and on November 17, 1983 went to a nursing home-type facility called the Slate Belt Medical Center. He was visited there by his daughters and, with difficulty, on November 18, 1983, he executed two powers of attorney.

5. Unfortunately, Mr. Shettler was again stricken and readmitted on November 26, 1983 to Easton Hospital. He had pneumonia, acute renal failure, a peptic ulcer and [a] urinary tract infection. He passed away in the hospital on December 5, 1983.

6. After his death and funeral, his daughter Joan Smith went to John Shettler's home and found his will in a tightly sealed box in a bedroom closet where her mother had always said it would be. Mr. Shettler had also shown Mrs. Williams this same location.

7. This will was duly probated on December 12, 1983 in the Office of the Register of Wills of Northampton County, Pa. It named his two daughters as co-executrices of his will and, after giving each grandchild the sum of $2,000, divided the estate between his two children.

8. In the time period between the probate and December 29, 1983, two court clerks observed one Ervin Hohensee approach the counter and ask for the estate file of John M. Shettler. The files are public records and Ervin Hohensee made notes about the contents and *copied from the will*. He then left.

9. On December 29, 1983, Ervin Hohensee returned and filed for probate a document which he claimed was a will of John M. Shettler which he signed on November 4, 1983 at Easton Hospital. Ervin Hohensee and a friend of his named Richard Wagner identified the signature on the will.

10. The will filed by Ervin Hohensee gives $2,000 to all the grandchildren as a group, and 20 percent of the estate to each of John M. Shettler's two children. The remainder of the estate is given to the executor, Ervin Hohensee, who also prepared and witnessed the will along with Richard Wagner.

11. Neither of John M. Shettler's children have ever heard him or his wife refer to Ervin Hohensee or Richard Wagner, nor have they ever met these two men. Neither of these two men attended the funeral or had any known friendship or business dealings with John M. Shettler.

12. A former United States Secret Service Senior Documents Examiner named G. R. Lesevich carefully detailed his extensive training and experience for the court. He is a certified forensic documents analyst, and has testified numerous times in military, federal and state courts. He was initially trained in document examination by the United States Army and certified by the Department of Defense and is now in private practice.

13. He has examined the purported November 4, 1983 will with a microscope and other devices and compared the signature thereon with numerous checks and other documents signed by John M. Shettler. He demonstrated for the court how the signatures show a gradual deterioration consistent with decedent's growing medical problems and loss of mind control in early November 1983. He demonstrated that John M. Shettler was not capable in November 1983 of making a signature such as appears on the November 4, 1983 will. He stated without hesitation that the signature of John M. Shettler on the November 4, 1983 will is a tracing and forgery.

14. Ervin Hohensee represented himself. Besides his own testimony, he called only one witness, John Thomas, III, who had examined the docu-

ments for some 45 minutes. Mr. Thomas stated that John M. Shettler's signature on the November 4th will could have appeared no later than late 1982 or early 1983. He did, nevertheless, opine that based upon the *personality* projected by the signature, it was that of John M. Shettler, an opinion which we find wholly speculative.

15. Richard Wagner did not appear for trial. Ervin Hohensee, who has law school training, testified that he met decedent once some 20 years ago, that he doesn't remember if he saw him since and that he received a call from someone he does not remember to go to see decedent at Easton Hospital. Upon arriving at the hospital, he claims decedent was alert, sitting in a chair, with no tubes in him. He says decedent then dictated the terms of a will which he recorded on paper, which he discarded. He then claims he prepared a will for decedent and returned to the hospital on November 4, 1983 with Richard Wagner, at which point decedent executed the will. On cross-examination, Ervin Hohensee answered most questions by saying he didn't remember. We regard his direct testimony as unworthy of belief.

16. On May 4, 1984, Ervin Hohensee was served with proper notice of the court hearings on May 16 and 17, 1984.

## DISCUSSION

This is a case in which the facts not only speak for themselves, but they also cry out in anguish to the highest levels of our system of justice for relief from acts of outrageous fortune. We are not only clearly and positively convinced, we are convinced virtually beyond any doubt, that the purported will of November 4, 1983 is nothing but a forgery and sham to

enrich its scrivener, witness, executor and main beneficiary, Ervin Hohensee. We begin by noting the language of our Supreme Court in Gold Will, 408 Pa. 41, 47, n.4, 182 A.2d 707 (1962):

"For all practical purposes, Attorney Harvey . . . was the scrivener of this will. Since Attorney Harvey was benefited in large part by the provisions of the will, this circumstance requires that his testimony be carefully scrutinized and not given the same weight ordinarily given the testimony of the scrivener of a will. Cuthbertson's Appeal, 97 Pa. 163; Wilson's Appeal, 99 Pa. 545; Yardley v. Cuthbertson, 108 Pa. 395; Armor's Estate, 154 Pa. 517, 26 Atl. 619; Llewellyn's Estate, 296 Pa. 74, 145 Atl. 810; Paul Will, 407 Pa. 30, 180 A.2d 68."

In the matter before us, Ervin Hohensee, although not a member of the bar, is nevertheless a person with law school training and substantial litigational experience.* He is the admitted scrivener of the will and benefited in large part by its provisions as an heir and executor.

Moreover, as a witness, Ervin Hohensee was evasive and unworthy of belief. He pondered most questions for an extended length of time. If he did answer, he usually stated that he' had already answered the question or didn't remember or wasn't sure. The court frequently had to order him to answer. What testimony he did give was wholly improbable, if not impossible, under careful scrutiny.

There was independent evidence from a physician, hospital records and decedent's daughters

---

*See, for instance, Scientific Living, Inc. v. Hohensee, 440 Pa. 280, 270 A.2d 216 (1970), cert. den., 402 U.S. 1012 (1971), reh. den., 404 U.S. 874 (1971), in which two deeds procured by fraud by the same Ervin Hohensee were set aside. Reference to this case and others appear in the record.

that, at the time of the purported execution of the will in November 1983, decedent was in a hospital bed with intravenous and oxygen tubes in his body. Nevertheless, Mr. Hohensee claimed that decedent was sitting up in a chair alone and unaided with no life-support tubes. There was independent evidence from the doctor and brain scan that at the time of the purported execution decedent had had the equivalent of a stroke and could not handle legal matters, much less feed himself. In spite of this, Mr. Hohensee claimed that decedent recognized him, even though he had not seen him for some 20 years, and then proceeded to dictate the terms of a new will. Erwin Hohensee would further have us believe that decedent chose to leave the major part of his estate to Ervin Hohensee in this new will and that decedent, who was a person unskilled in legal matters, stated the detailed distribution scheme set forth in the new will. The original will was in the place where decedent and his wife always said it would be, whereas the new will was in the hands of a stranger to decedent's children. See Brubaker Will, 2 Pa. Fiduc.2d 129, 133 (1982). In short, Ervin Hohensee's testimony is pure fiction, and we dismiss it as such.

Since the evidence given by Ervin Hohensee is not credible, the testimony of the handwriting expert is sufficient to establish the forgery of the November 4, 1983 will. Young Estate, 347 Pa. 457, 32 A.2d 901 (1943); Wassersweig Will, 27 Pa. Fiduc. 599 (1977); Shupe Will, 21 Pa. Fiduc. 230 (1971).

The qualifications set forth for Mr. Lesnevich as a questioned documents examiner were impeccable. Suffice it to say that he worked in that capacity for the United States Secret Service and was certified by his professional society and the United States

Army. His opinion and the reasons in support thereof are most logical and straightforward. A man who has deteriorated and is not physically capable of signing his name with care, neatness and precision cannot suddenly execute a document in atypical style. Even the supposed expert called by Ervin Hohensee agreed that decedent's execution of the powers of attorney in November 1983 showed that he had a severe illness, and further he agreed that the signature on the November 4, 1983 will was consistent with execution not in November of that year, but at best in early 1983. We do not believe, however, that this supposed expert, Mr. Thomas, or any mortal for that matter, can "read" the identity of a person who signed a document from the mere handwriting alone without comparing it with other signatures. Accordingly, we disbelieve his testimony.

## CONCLUSIONS OF LAW

1. The testimony of the proponent not being credible, expert testimony is competent as to the invalidity of the signature on the November 4, 1983 will.

2. The November 4, 1983 will is a forgery and is invalid.

## DECREE NISI

And now, this May 25, 1984, the matter having been certified and heard de novo, the court determines that the will dated November 4, 1983 naming Ervin Hohensee as executor is a forgery and is void. Accordingly, no letters of administration may be granted thereon. Costs are to be allowed to those contesting the aforesaid will pursuant to 20 Pa.C.S. §791. Furthermore, pursuant to the court's equita-

ble powers, the court directs the clerk to file copies of the record and this adjudication with the Northampton County District Attorney and the Pennsylvania State Police for the consideration of criminal prosecution.

The prothonotary shall give notice to counsel for the parties of the entry of this decree nisi and if no exceptions are taken within 10 days, this decree nisi shall become a final decree.